UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STEVEN M. JORDAN,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>CAROLYN W. COLVIN,<br><br>　　　　Defendant. | Case No. 14-cv-05037-BLF<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; AND REMANDING FOR FURTHER PROCEEDINGS**<br><br>[Re: ECF 13, 18] |

Plaintiff Steven Jordan appeals a final decision of the Commissioner of Social Security denying his application for a period of disability and disability insurance benefits under Title II of the Social Security Act. Before the Court are the parties' cross-motions for summary judgment, which have been fully briefed. Upon consideration of the briefing[1] and for the reasons set forth below, the Court GRANTS Mr. Jordan's motion, DENIES the Commissioner's motion, and REMANDS for further proceedings consistent with this order.

**I.    BACKGROUND**

Steven Jordan, a United States citizen, was born on November 14, 1972. Admin. R. ("AR") 109. He completed twelfth grade, AR 56-57, 143, and most recently worked in various departments at a grocery store, AR 144. He has also worked as a customer service representative, machine operator, shipping and receiving clerk, shuttle driver, and mover. *Id*; AR 151. He is married and has three children. AR 110.

**A.    Medical History**

On March 25, 2009, Mr. Jordan was working at Lucky's grocery store in the bakery and

---

[1] This matter was submitted without oral argument pursuant to Civil Local Rule 16-5.

1   deli departments when he attempted to move a 75-pound slicer from right to left, in order to clean
2   the area below. AR 245. Mr. Jordan felt immediate pain in his right lower back but he completed
3   his shift that day. *Id*. At the end of his shift the next day, he informed his boss that his back was
4   still hurting. *Id*. His symptoms worsened and on March 27, 2009, two days after the incident, Mr.
5   Jordan went to the emergency room. *Id*. At the emergency department, Mr. Jordan was given an
6   injection and instructed to follow up with a spine specialist. *Id*.

7   In relation to this injury, Mr. Jordan appears to have filed a claim for worker's
8   compensation. AR 16. During the processing of the claim, a significant number of medical
9   records were produced. AR 17. The Court summarizes only the pertinent events from Mr.
10  Jordan's medical records.

11  Mr. Jordan followed up with his primary care doctor, Dr. Jean Luong, on April 3, 10, and
12  May 1, 2009. AR 227-229. On May 11, 2009, a MRI was performed which revealed a mild to
13  moderate degenerative change at the L5-S1 level with mild to moderate disc bulge and mild to
14  moderate foraminal stenosis, disc space narrowing and disc dessication and endplate sclerosis at
15  this level. AR 231.

16  On May 29, 2009, Mr. Jordan was seen by an occupational physician, Dr. Edward Cooper.
17  AR 318. Dr. Cooper placed Mr. Jordan on modified duty. AR 318, 371. In the ensuing seven
18  months, Mr. Jordan's modified duty became more stringent despite Mr. Jordan receiving physical
19  therapy and an epidural steroid injection. AR 245.

20  During this time, Mr. Jordan was deemed a poor candidate to return to his job in the bakery
21  and deli departments. AR 1012. He therefore returned to work in a modified position as a greeter
22  which also included watching over the liquor area. AR 1002. This position required Mr. Jordan
23  to stand for prolonged periods which caused increased pain and problems down his right leg. AR
24  1002. Dr. James Petros modified Mr. Jordan's standing restriction to no more than 10 minutes
25  every hour. AR 1002. In November 2009, Mr. Jordan also had a work capacity evaluation which
26  indicated that he could not perform the duties required by a bakery/deli clerk. *Id*. Mr. Jordan was
27  subsequently transferred to the coffee department where he continued in this position until early
28  2010, when he was fired for drinking coffee without paying for it. *Id*.

In 2010, Mr. Jordan remained in the care of Dr. Petros and visited him several times over the course of 2010 and 2011. AR 916, 923, 928, 935, 944, 958, 975, 981, 992. Dr. Petros opined that Mr. Jordan could not lift more than 15 pounds, could minimally bend, stoop, and twist at the waist and should frequently stretch. *Id.*

In September 2010, Mr. Jordan aggravated his injury after standing in line for about four hours at a concert. AR 1013. In November 2010, Mr. Jordan was seen by Dr. Maureen Miner in conjunction with his worker's compensation claim. AR 998. Dr. Miner opined that Mr. Jordan could not sit, stand, or walk for more than 30 minutes at a time, lift more than 20-25 pounds, or repetitively bend or stoop. AR 1013.

In November 2011, Dr. W. Jackson, a non-examining agency physician, determined that Mr. Jordan could perform a range of sedentary work. *Id.* at 1094-95. A month later, in December 2011, an EMG showed lumbar radiculopathy at the L5-S1 level. AR 866. As a result, Dr. Morteza Farr recommended a fusion to treat the complete collapse of the disc at the L5-S1 area. AR 897.

In September 2012, Dr. Tulsidas Gwalani examined Mr. Jordan and diagnosed him with lumbar disc protrusions at three levels of the lumbar spine, right-sided S1 nerve root compression with foraminal stenosis, right lumbar radiculitis and sciatica, and chronic myofascial pain syndrome. AR 1155. Dr. Gwalani opined that Mr. Jordan should return to work "with restrictions of sitting at a sedentary level." *Id.* He also ordered a psychological examination. *Id.* Mr. Jordan saw psychologist Dr. Darius Fanibanda in November 2012. AR 1150-51. Dr. Fanibanda found Mr. Jordan to be defensive about psychological treatment for pain. AR 1151. Mr. Jordan also indicated that his pain medication would interfere with his ability to work. *Id.*

**B.    Administrative Hearing**

Mr. Jordan, his attorney, and a vocational expert appeared before the ALJ on March 6, 2013. AR 52-69. After the vocational expert testified that none of Mr. Jordan's past work was sedentary in nature, the ALJ noted the main issue at the hearing was whether Mr. Jordan had skills transferrable to other jobs. AR 56. Mr. Jordan testified that he completed 12th grade but did not receive a high school diploma. AR 56-57.

Upon questioning from his attorney, Mr. Jordan described an average day. AR 61. Mr. Jordan experiences back pain as soon as he wakes up and his leg is usually numb. *Id*. He has difficulty moving to the bathroom and usually returns back to bed where he lays down until 11:00 a.m. *Id*. During the day, his wife brings meals to him in bed. *Id*. If he starts to have difficulty lying down, he will sit up for about 20 minutes but is unable to sit up for any longer without experiencing lower back pain. *Id*. He also uses a cane to walk and despite using a cane, on two occasions he fell after his leg gave out on him. AR 58. With a cane, he is able to stand, with pain, in one spot for around 30 minutes. AR 61. He is able to walk approximately one city block before the pain is too difficult for him to endure. AR 61-62.

He also testified that he lives with his wife and three children. AR 59. At home, Mr. Jordan stated that his wife was responsible for cleaning, laundry, cooking, and grocery shopping. *Id*. Mr. Jordan said that in his current condition he was not able to help with any of those duties though he was able to place meals in the microwave. *Id*. In the shower, Mr. Jordan testified he uses a shower chair. AR 60. He also has a hard time getting dressed. *Id*.

Mr. Jordan stated that he had seen four surgeons who all opined that he needed surgery. *Id*. He said he had not yet gone through with surgery because he was waiting for approval from his worker's compensation insurance. AR 61. Mr. Jordan testified that he had taken pain medication but the medications made him drowsy and caused him severe constipation and rectal bleeding. *Id*. at 62-63. He also takes other medications to try and counter these side effects. AR 63.

Upon questioning from the ALJ, Mr. Jordan discussed how he initially hurt his back by moving a meat slicer. AR 64. Mr. Jordan also testified that his worker's compensation claim was pending and at the time of the hearing, he had not yet received any money. *Id*.

The hearing ended with an examination of the vocational expert by the ALJ and Mr. Jordan's attorney. AR 65. The ALJ asked one hypothetical of the vocational expert. It focused on an individual at a sedentary level; occasional posturals but never climbing ropes, ladders, or scaffolding; and limited to pretty simple work due to the medication side effects; and moderate limit in the ability to understand and carryout complex instructions. *Id*. The vocational expert

4

testified that this person could perform work in the sedentary, unskilled occupational base such as working as an unskilled order clerk, in an assembly position, or in an inspector and tester position. Mr. Jordan's attorney asked the vocational expert whether an individual was employable if they needed to lay down every hour for ten minutes. AR 65-66. The vocational expert testified that there would be no jobs in the economy with that limitation. AR 66.

### C.    The ALJ's Decision

The ALJ found that Mr. Jordan was insured through March 31, 2015. AR 15. At step one, the ALJ determined that Mr. Jordan had not engaged in substantial gainful activity since his alleged onset date of January 5, 2010. *Id*. At step two, the ALJ also found that Mr. Jordan had a severe impairment of degenerative disc disease of the lumbar spine. *Id*. At step three, the ALJ concluded that this condition was not severe enough to limit Mr. Jordan's ability to work because most of his physical examinations showed minimal abnormalities, and Mr. Jordan did not actively seek surgery for his condition or take pain medication for his symptoms. AR 15-16.

Prior to making the step four determination, the ALJ found that Mr. Jordan has residual functional capacity to perform sedentary work with occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching, or crawling; occasional lifting of up to 10 pounds; and no climbing of ladders, ropes, or scaffolds. AR 16-19. In making this finding, the ALJ accorded controlling weight to the opinions of Mr. Jordan's treating physicians but found Mr. Jordan's subjective complaints were "not entirely credible." *Id*.

At step four, the ALJ found that based upon the residual functional capacity assessment, Mr. Jordan could not perform any past relevant work. *Id*. At step five, based on Mr. Jordan's age, education, work experience, residual functional capacity, and hypotheticals posed to the vocational expert, the ALJ concluded that Mr. Jordan was capable of working in other jobs that existed in significant numbers in the national economy. *Id*.

### D.    Motions for Summary Judgment

Mr. Jordan filed this action on November 14, 2014 pursuant to 42 U.S.C. § 405(g). ECF 1. Both parties subsequently filed cross-motions for summary judgment. ECF 13, 18. In his motion for summary judgment, Mr. Jordan alleges that (1) substantial evidence did not support the ALJ's

1  evaluation of treating physiatrist Dr. Petros' opinions; (2) substantial evidence did not support the
2  ALJ's evaluation of physiatrist Dr. Miner's opinions; (3) substantial evidence did not support the
3  ALJ's evaluation of Dr. Gwalani's "sedentary" work opinion; (4) the ALJ did not provide clear
4  and convincing reasons for discrediting Mr. Jordan's credibility; and (5) the ALJ's residual
5  functional capacity did not reflect his finding that Mr. Jordan was limited to simple, repetitive
6  work.  Pl.'s Mot. 2, ECF 13.  In Defendant's motion, the Commissioner argues that (1) the ALJ
7  adequately considered the medical opinions of Dr. Petros, Dr. Miner, and Dr. Gwalani; (2) the
8  ALJ properly evaluated the credibility of Mr. Jordan's testimony; and (3) the ALJ's residual
9  functional capacity did not mirror his findings because of a harmless scrivener's error.  Def.'s
10 Mot. 2, ECF 18.

## II.   LEGAL STANDARD

### A.   Standard of Review

District courts "have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 USC § 405(g).  However, "a federal court's review of Social Security determinations is quite limited."  *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015).  Federal courts "'leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.'"  *Id.* (quoting *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014)).

A court "will disturb the Commissioner's decision to deny benefits only if it is not supported by substantial evidence or is based on legal error."  *Brown-Hunter*, 806 F.3d at 492 (internal quotation marks and citation omitted).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and must be more than a mere scintilla, but may be less than a preponderance."  *Rounds v. Comm'r of Soc. Sec. Admin.*, 807 F.3d 996, 1002 (9th Cir. 2015) (internal quotation marks and citations omitted).  A court "must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  *Id.* (internal quotation marks and citation omitted).   If the evidence is susceptible to more than one rational interpretation, the ALJ's

findings must be upheld if supported by reasonable inferences drawn from the record. *Id.*

Finally, even when the ALJ commits legal error, the ALJ's decision will be upheld so long as the error is harmless. *Brown-Hunter*, 806 F.3d at 492. However, "[a] reviewing court may not make independent findings based on the evidence before the ALJ to conclude that the ALJ's error was harmless." *Id.* The court is "constrained to review the reasons the ALJ asserts." *Id.*

### B. Standard for Determining Disability

Disability benefits are available under Title II of the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

"To determine whether a claimant is disabled, an ALJ is required to employ a five-step sequential analysis, determining: (1) whether the claimant is doing substantial gainful activity; (2) whether the claimant has a severe medically determinable physical or mental impairment or combination of impairments that has lasted for more than 12 months; (3) whether the impairment meets or equals one of the listings in the regulations; (4) whether, given the claimant's residual functional capacity, the claimant can still do his or her past relevant work; and (5) whether the claimant can make an adjustment to other work." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (internal quotation marks and citations omitted). The residual functional capacity, or RFC, referenced at step four is what a claimant can still do despite his or her limitations. *Id.* at 1160 n.5. "The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

### III. DISCUSSION

Mr. Jordan challenges the ALJ's step four and step five determinations, alleging that substantial evidence did not support the ALJ's evaluation of Dr. Petros', Dr. Miner's, and Dr. Gwalani's medical opinions; the ALJ did not provide clear and convincing reasons for finding Mr. Jordan not credible; and that the ALJ's residual functional capacity did not reflect his finding that

Mr. Jordan was limited to simple and repetitive work.

### A. The ALJ's Evaluation of Dr. Petros' Opinions Was Not Supported by Substantial Evidence

An ALJ must consider all medical opinion evidence. 20 C.F.R. § 404.1527(b). According to the Ninth Circuit, a reviewing court must distinguish between: (1) treating physicians, (2) examining physicians – those who examine but do not treat the claimant, and (3) non-examining physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "The opinion of the treating physician is… entitled to greater weight than that of an examining physician[ and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). If a treating physician's opinion is not contradicted by another doctor, it may be rejected for only "clear and convincing reasons supported by substantial evidence." *Ryan v. Comm. Of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

Treating physician Dr. Petros treated Mr. Jordan in 2009, 2010, and 2011. During these treatments, Dr. Petros noted that Mr. Jordan could, *inter alia*, minimally bend/stoop, minimally twist at the waist, and life/pull/push a maximum of 15 pounds. AR 712 (treatment on Nov. 8, 2010), 726 (treatment on Oct. 14, 2010), 747 (treatment on April 25, 2011), 772 (treatment on Dec. 20, 2010), 784 (treatment on July 18, 2011), 794 (treatment on June 20, 2011), 804 (treatment on May 23, 2011). Dr. Petros also opined that Mr. Jordan could only minimally twist at the waist and needed to stretch frequently. AR 916 (treatment on Aug. 18, 2011), 923 (treatment on July 18, 2011), 928 (treatment on June 20, 2011), 935 (treatment on April 25, 2011), 944 (treatment on March 28, 2011), 958 (treatment on Jan. 31, 2011), 975 (treatment on Dec. 20, 2010), 981 (treatment on Dec. 6, 2010), 992 (Nov. 8, 2010).

In discussing Dr. Petros' treatments of Mr. Jordan, the ALJ focused on Dr. Petros' March 2011 treatment and summarized it by saying Mr. Jordan "demonstrated normal range of motion with flexion, extension, bending and rotation." AR 17. In deference to Dr. Petros' status as a treating physician, the ALJ stated that "[a]ll of these opinions are accorded controlling weight as opinions provided by treating physicians." AR 18. The ALJ also noted that "the evidence file

1    contains several treating source statements limiting the claimant to lifting no more than 15 pounds
2    with minimal bending and stooping. This opinion is consistent with the residual functional
3    capacity statement found in this decision." AR 18.
4         Yet, the ALJ's residual functional capacity assessment did not reflect his finding that
5    controlling weight should be afforded to Dr. Petros' opinion that Mr. Jordan could only minimally
6    bend and stoop.  The residual functional capacity assessment indicated that Mr. Jordan could
7    "*occasionally* climb ramps/stairs, balance, stoop, kneel, crouch, or crawl." AR 16 (emphasis
8    added).  Moreover, the residual functional capacity did not include Dr. Petros' opinions that Mr.
9    Jordan could only minimally twist at the waist and needed to stretch frequently.  By failing to
10   accurately include all of Mr. Jordan's impairments in determining Mr. Jordan's residual functional
11   capacity, the ALJ asked the vocational expert an incomplete hypothetical question.  "Because
12   neither the hypothetical nor the answer properly set forth all of [Mr. Jordan's] impairments" there
13   is not substantial evidence to support ALJ's findings.  *Hill v. Astrue,* 698 F.3d 1153, 1162 (9th Cir.
14   2012) (citing *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984)).
15        In attempting to justify the ALJ's assessment, the Commissioner makes three arguments:
16   First, the Commissioner argues that the ALJ's determination that Mr. Jordan had the residual
17   functional capacity to perform "sedentary" work was more restrictive than the modified work duty
18   that Dr. Petros ordered for Mr. Jordan.  Def.'s Mot. 6, ECF 18.  However, the Commissioner's
19   argument misconstrues the record.  In the 2009, Mr. Jordan was placed on modified work duty but
20   the alleged onset date as determined by the ALJ at step one was January 5, 2010.  As a result, the
21   fact that Dr. Petros may have placed Mr. Jordan on less restrictions prior to the alleged onset date
22   is not relevant.
23        Second, the Commissioner argues that Mr. Jordan has not shown that any of the jobs
24   identified by the vocational expert require more than minimal twisting at the waist.  *Id*.  As
25   support for this argument, the Commissioner claims that Mr. Jordan has the burden of proof to
26   provide evidence used to make a residual functional capacity determination.  The Commissioner's
27   argument conflates the burdens of proof in determining social security eligibility.  While Mr.
28   Jordan "is responsible for providing the evidence" used to make a finding about his residual

functional capacity, 20 C.F.R. §404.1545(a)(3), at step five, "[the Commissioner] must provide evidence about the existence of work in the national economy that [Mr. Jordan] can do" given his age, education, work experience, and residual functional capacity, 20 C.F.R. § 404.1512(f). Here, substantial evidence did not support the ALJ's finding that work existed in the national economy that Mr. Jordan could perform because the ALJ did not include Dr. Petros' opinion that Mr. Jordan could only minimally twist at the waist in his residual functional capacity. *See Taylor v. Comm'r of Soc. Sec.*, 659 F.3d 1228, 1235 (9th Cir. 2011) ("[T]he ALJ failed to include all of [claimant's] impairments in his residual functional capacity determination and, therefore, asked an erroneous hypothetical question of the vocational expert. Because neither the hypothetical nor the answer properly set forth all of [claimant's] impairments, the vocational expert's testimony cannot constitute substantial evidence to support the ALJ's findings.") (internal quotations omitted).

Finally, the Commissioner argues that Mr. Jordan's counsel failed to ask the vocational expert about whether any of the identified jobs required more than minimal twisting at the waist. *Id*. As explained, 20 C.F.R. § 404.1512(f) requires the Commissioner, not Mr. Jordan or his counsel, to ask the vocational expert appropriate hypotheticals.

Accordingly, the Court finds substantial evidence does not support the ALJ's evaluation of Dr. Petros' opinions.

### B. The ALJ's Evaluation of Dr. Miner's Opinions Was Not Supported by Substantial Evidence

Dr. Miner examined Mr. Jordan in November 2010 in connection with Mr. Jordan's worker's compensation claim. AR 238-271. Dr. Miner opined that Mr. Jordan could not sit for more than 30 minutes at a time without a rest. AR 1013. The ALJ discussed Dr. Miner's examination, AR 17, but did not discuss Dr. Miner's notation that Mr. Jordan's "[w]ork restrictions include no sitting, standing, or walking for more than 30 minutes at a time without a rest…" AR 256.

As a result, although the ALJ gave controlling weight[2] to Dr. Miner's opinion, the ALJ's

---

[2] Moreover, it is not clear that Dr. Miner was a treating physician as it appears Dr. Miner was an examining physician. If Dr. Miner is an examining physician, than her opinions may not be given "controlling weight" because such weight can only be given to opinions of treating physicians. 20

10

residual functional capacity assessment did not reflect Dr. Miner's opinion that Mr. Jordan could not sit for more than thirty minutes at a time. By failing to accurately include all of Mr. Jordan's impairments in determining Mr. Jordan's residual functional capacity, the ALJ asked the vocational expert an incomplete hypothetical question. "Because neither the hypothetical nor the answer properly set forth all of [Mr. Jordan's] impairments" there is not substantial evidence to support ALJ's findings. *Hill v. Astrue,* 698 F.3d 1153, 1162 (9th Cir. 2012) (citing *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984)).

The Commissioner argues that the ALJ relied upon on an earlier opinion from Dr. Miner in making his residual functional capacity assessment. Def.'s Mot. 7, ECF 18. While the ALJ discusses Dr. Miner's March 2009 opinion, this opinion predated the alleged onset date of January 5, 2010. Moreover, the ALJ never mentioned Dr. Miner's 2010 opinion that Mr. Jordan could not sit for more than 30 minutes at a time. Relying on *Tommasetti v.* Astrue, 533 F.3d 1035, 1041-42 (9th Cir. 2008), the Commissioner claims the "ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." While this is true, the ALJ must explain how he is resolving any potential ambiguities in the medical evidence. *Id*. at 1041 ("The ALJ must consider *all* medical opinion evidence…Further, after discussing Tommasetti's medical history and treatments *in detail*, the ALJ found…") (emphasis added). Here, the ALJ neither mentioned nor discussed Dr. Miner's opinion that Mr. Jordan could not sit for more than 30 minutes at a time.

The Commissioner also repeats the argument that it was Mr. Jordan's counsel duty to ask the vocational expert whether the identified sedentary jobs could be performed if Mr. Jordan could not sit for more than 30 minutes. As the Court explained with respect to Dr. Petros' opinion, 20 C.F.R. § 404.1512(f) requires the Commissioner, not Mr. Jordan or his counsel, to ask the vocational expert appropriate hypotheticals.

Finally, the Commissioner claims that Dr. Miner's opinion is based on Mr. Jordan's own assessment of his abilities rather than clinical findings. The Commissioner argues that Dr. Miner's opinion is invalidated based on Mr. Jordan's lack of credibility. However, the ALJ never

---

C.F.R. § 404.1527(c). The Commissioner did not address Mr. Jordan's arguments that the ALJ may have applied an improper legal standard to Dr. Miner's opinions.

discussed his reasons for not considering Dr. Miner's opinions and in fact stated "[a]ll of [medical] opinions are accorded controlling weight as opinions provided by treating physicians." AR 18. The Commissioner arguments on appeal are an improper post-hoc rationalization of the ALJ's findings. *Pinto v. Massanari*, 249 F.3d 840, 847–48 (9th Cir. 2001). As a result, the Court finds the ALJ's evaluation of Dr. Miner's opinions is not supported by substantial evidence.

### C. The ALJ's Evaluation of Dr. Gwalani's Opinions Was Not Supported by Substantial Evidence

Dr. Gwalani, a pain management specialist, saw Mr. Jordan in September 2012. AR 1155. He opined that Mr. Jordan should "return to work with restrictions of sitting at a sedentary level." *Id*. In his findings, the ALJ noted that Dr. Gwalani "restricted the claimant to sedentary-level work." AR 18. In determining Mr. Jordan's residual functional capacity, the ALJ gave controlling weight to Dr. Gwalani's opinion that Mr. Jordan could perform sedentary work. *Id*.

SSR 96-5 states that "[f]rom time-to-time, medical sources may provide opinions that an individual is limited to 'sedentary work,' 'sedentary activity,' 'light work,' or similar statements that appear to use the terms set out in our regulations and Rulings to describe exertional levels of maximum sustained work capability. Adjudicators must not assume that a medical source using terms such as 'sedentary' and 'light' is aware of our definitions of these terms." Contrary to SSR 96-5, the ALJ appears to have assumed that Dr. Gwalani was using the term "sedentary" in the same way that the Social Security Administration uses the term. It is not clear if Dr. Gwalani was using the Social Security's Administration of sedentary, but if he was, that presents another problem - his opinion would conflict with Dr. Petros' and Dr. Miner's opinions. However, the ALJ did not reconcile this conflict and instead stated "[a]ll of [medical] opinions are accorded controlling weight as opinions provided by treating physicians," AR 18. *Schultz v. Colvin*, 32 F. Supp. 3d 1047, 1060 (N.D. Cal. 2014) ("The ALJ's role as fact-finder imposes on [him] a duty to resolve conflicts in medical evidence.").

The Commissioner argues that the ALJ reasonably relied on Dr. Gwalani's opinion that Mr. Jordan could perform sedentary work. Def.'s Mot. 7, ECF 18. The Commissioner's arguments fail to address SSR 96-5 or the conflict between assuming Dr. Gwalani's choice of

words was the same as the Social Security Administration's definition of "sedentary" and Dr. Petros' and Dr. Miner's opinions. Accordingly, substantial evidence does not support the ALJ's evaluation of Dr. Gwalani's opinions.

### D. The ALJ Did Not Provide Clear and Convincing Reasons for Discrediting Mr. Jordan's Credibility

The ALJ found Mr. Jordan was not credible based on the combination of five reasons. AR 19. First, during his worker's compensation process, Mr. Jordan was able to work with modified duties. *Id*. Second, Mr. Jordan exaggerated the extent of his pain because he used a cane despite no evidence that he was prescribed a cane. *Id*. Third, Mr. Jordan did not actively pursue surgery despite being considered for surgical intervention on several occasions. *Id*. Fourth, Mr. Jordan has not taken pain medication on a regular basis. *Id*. Finally, Mr. Jordan appeared defensive during a psychological assessment when presented with the possibility of doing a sedentary job with modifications.

Mr. Jordan argues that the ALJ incorrectly assessed the medical opinions to determine he was never restricted from working; his treating physician Dr. Azar prescribed him a cane; the ALJ did not consider that he was waiting for his worker's compensation insurance to approve his surgery; the ALJ is not a pain management specialist; and the ALJ placed undue importance on his "vague discussion" with a psychologist. Pl.'s Mot. 12-15, ECF 13. In opposition, the Commissioner reiterates that ALJ's findings but does not directly respond to any of Mr. Jordan's arguments.

In the absence of evidence of malingering, the "ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014). The Court finds the ALJ has not provided clear and convincing reasons for finding Mr. Jordan not credible. First, although at one point in time, Mr. Jordan was able to work with modified duties, he was let go for reasons unrelated to his physical complaints in January 2010. His alleged onset date was January 5, 2010. As a result, his ability to work, even with modified duties, prior to his alleged onset date, is not a clear and convincing reason that Mr. Jordan exaggerated his pain after his alleged onset date.

Second, contrary to the ALJ's assertion, Mr. Jordan was prescribed a cane by Dr. Azar. AR 672-73 ("dispense medications and cane…[d]ispense one aluminum cane and properly adjusted for use at work and home…").

Third, the ALJ failed to consider that Mr. Jordan may not have undergone surgery because he was waiting for approval from his worker's compensation. *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (Claimant presented testimony that "for her chronic fatigue and pain because, as a result of not being able to maintain a job, she had no insurance and could not afford treatment. Where a claimant provides evidence of a good reason for not taking medication for her symptoms, her symptom testimony cannot be rejected for not doing so.").

With respect to the fourth and fifth reasons, Mr. Jordan has not provided sufficient explanation for his failure to take pain medication and his defensive nature when examine by the psychologist. However, in light of the fact that the ALJ assessed Mr. Jordan's credibility on the totality of five reasons, the Court is remanding this case for the ALJ to review Mr. Jordan's credibility consistent with this Order.

### E. The ALJ's Residual Functional Capacity Did Not Reflect His Finding That Mr. Jordan Was Limited to Simple, Repetitive Work

The ALJ determined that "[d]ue to possible medication side effects…Mr. Jordan [is further limited] to simple, repetitive work." AR 18. However, the ALJ omitted this limitation from his residual functional capacity. The Commissioner acknowledges that this limitation was not included in the ALJ's residual functional capacity but argues that it was the result of a harmless scrivener's error. Def.'s Mot. 11, ECF 18. According to the Commissioner, the ALJ included the limitation of "simple, repetitive work" in his hypotheticals to the vocational expert. *Id*. At the hearing, the ALJ asked the vocational expert to consider a person who was "limited to pretty simple work due to the medication side effects [Mr. Jordan] mentioned" and the vocational expert considered sedentary unskilled occupations. *Id*. The Commissioner claims these occupations are of "simple, repetitive work" because "unskilled work is work which needs little or no judgment to do simple duties that can be learned in a short period of time." *Id*. (quoting 20 C.F.R. § 404.1568).

Mr. Jordan argues that the ALJ did not just ask the vocational expert to consider a situation where a person was "limited to pretty simple work due to the medication side effects" but also included in the hypothetical that the person would have a "moderate limit in the ability to understand and carryout complex instructions." Pl.'s Reply 9, ECF 19. According to Mr. Jordan, it was inconsistent for the ALJ to find that he was restricted to "simple, repetitive work" but could also carry out complex instructions. As further evidence of this inconsistency, Mr. Jordan notes that one of the step-five occupations that the ALJ relied upon, order clerk, has a DOT Reasoning Level of 3. AR 20 (citing DOT No. 209.567-014). Mr. Jordan claims that someone who is limited to "simple, repetitive work" cannot perform a job requiring a DOT Reasoning Level of 3.

The Court agrees with Mr. Jordan and finds that there was a disconnect between the ALJ's determination that Mr. Jordan was limited "simple, repetitive work" and the ALJ's residual functional capacity assessment that Mr. Jordan was "limited to pretty simple work" but had a "moderate limit in the ability to understand and carryout complex instructions." This disconnect is apparent because the vocational expert opined that Mr. Jordan could perform the occupation of an order clerk, which the ALJ adopted. However, an order clerk position has a DOT Reasoning Level of 3. DOT No. 209.567-014. "The DOT describes the requirements for each listed occupation, including the necessary General Educational Development ('GED') levels; that is, 'aspects of education (formal and informal) ... required of the worker for satisfactory job performance.'" *Zavalin v. Colvin*, 778 F.3d 842, 846 (9th Cir. 2015). These GED levels "includes the reasoning ability required to perform the job, ranging from Level 1 (which requires the least reasoning ability) to Level 6 (which requires the most)." *Id*. In *Zavalin*, the Ninth Circuit held that there is "an inherent inconsistency between his limitation to simple, routine tasks, and the requirements of Level 3 Reasoning." *Id*. at 846-47. Although it is not clear, even if the ALJ's residual functional capacity assessment accurately reflected Mr. Jordan's limitations, there was a conflict between the vocational expert's testimony and the DOT. In such a situation, "the ALJ is required to reconcile the inconsistency." *Id*. at 846. "The ALJ must ask the expert to explain the conflict and "then determine whether the vocational expert's explanation for the conflict is reasonable" before relying on the expert's testimony to reach a disability determination." *Id.* "The

15

ALJ's failure to resolve an apparent inconsistency may leave [the Court] with a gap in the record that precludes [a determination of] whether the ALJ's decision is supported by substantial evidence." *Id*. In this case, the ALJ did not do this, and the Court must remand this case for further proceedings.

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Mr. Jordan's motion is GRANTED and the Commissioner's motion is DENIED. The action is REMANDED for further administrative proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated: March 25, 2016

_____
BETH LABSON FREEMAN
United States District Judge